## MORRIS v. DUNBAR.

(Circuit Court of Appeals, Third Circuit. February 15, 1910.)

No. 94 (1,216).

CORPORATIONS (§ 144*)—UNPAID STOCK—TRANSFER—SUBSCRIBER'S LIABILITY —STATUTES.

The Pennsylvania street railway act of June 24, 1889 (P. L. 211), providing for the transfer of corporate stock of a street railway company so as to relieve the original subscriber from liability for future assessments only after the stock shall have been fully paid, was modified by Act June 24, 1895 (P. L. 258), relating to corporations generally, and authorizing the transfer of corporate shares before payment in full on declaring that his assignee shall take it subject to all payments due and to become due thereon, that the assignment shall be entered on the corporation's books, and the assignee thereupon become a member of the corporation and be subject to the same obligations as were formerly imposed on his assignor; and hence, where an original subscriber to the stock of the street railroad assigned certain of his shares before they were fully paid in good faith, the assignee, and not the assignor, was liable for the unpaid portion of the price on the corporation's insolvency.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 529-531; Dec. Dig. § 144.*]

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Action by Walter Morris, as receiver of the Kittanning & Cowanshannock Valley Street Railway Company, against Charles Dunbar. Judgment for plaintiff for less than the relief demanded, and he brings error. Affirmed.

L. C. Barton, for plaintiff in error.

John N. Dunn and A. S. Moorhead, for defendant in error.

Before GRAY and LANNING, Circuit Judges, and YOUNG, District Judge.

LANNING, Circuit Judge. The action in the court below was brought by Walter Morris, receiver of the Kittanning & Cowanshannock Valley Street Railway Company, against Charles Dunbar to recover the balance alleged to be due to the receiver from the defendant Dunbar on the latter's subscription for 170 shares of the capital stock of the railway company. The par value of the stock was $50 per share. For the 170 shares it was therefore $8,500. In his statement or declaration the receiver admits the payment of $650 on account of the subscription, and claims the balance of $7,850. Dunbar's subscription was made by signing the articles of association of the railway company, dated December 9, 1901; he being one of the incorporators. The railway company is now insolvent, and the unpaid sums on stock subscriptions are needed for the satisfaction of creditors' claims. Assessments of the whole of the unpaid sums were made by the court below, and the receiver was duly ordered to commence actions to recover such sums. The defense in the present case was that of the 170 shares subscribed for by Dunbar 150 were sold by the railway company to other parties,

who respectively paid the company either in whole or in part therefor. Of the remaining 20 shares the defense was that Dunbar paid in full for 13 of them. The court, believing these defenses had been established, directed the jury to render a verdict in favor of the receiver for the remaining seven shares—that is, for $350, with interest, amounting in all to $388.50—for which judgment was entered. The receiver now prosecutes this writ of error.

The facts disclosed by the record show that the total amount of the authorized capital stock of the railway company was 1,500 shares of the par value of $75,000. Of these 1,500 shares 400 (including Dunbar's 170 shares) were subscribed for by the incorporators. Certificates for the remaining 1,100 shares were delivered to John Shrader, and an independent examination of the proofs by this court shows that there is no difficulty in ascertaining the names of the persons to whom those 1,100 shares were subsequently transferred, or who are at the present time the record owners thereof. Some of the certificates for the 1,100 shares passed after assignment by Shrader through the hands of Dunbar, but he was not the owner of any of them when the company went into the hands of the receiver, and the action against him is for the recovery of the balance alleged to be due from him for the 170 shares which are a part of the 400 shares subscribed for by the incorporators, and not for any balance due on any of the 1,100 shares. The proofs concerning the history of the 1,100 shares were properly admitted for the purpose of showing that the portion of them which Dunbar once owned constituted no part of the 170 shares for which he subscribed as an incorporator.

The railway company's books show that 150 of the 170 shares subscribed for by Dunbar were sold to other persons between January 7 and September 30, 1902. No certificates for these 150 shares were ever issued to him, but the shares were sold by the railway company to those other persons with his consent. In legal effect, therefore, the sales were made by him. In the absence of any statutory provision on the subject, the general rule of the law is that where a stockholder makes an absolute transfer of his stock in good faith, and the transfer is duly entered on the corporate books, he will not be liable upon future assessments or calls. In some jurisdictions, however, the rule is modified by statute, and in a few of our states the liability of the transferror of stock continues after transfer without legislative enactment to that effect. In Pennsylvania, for example, it was held in Messersmith v. Sharon Savings Bank, 96 Pa. 440 (decided in 1880), that a subscriber for stock of a corporation remained liable on calls for the unpaid balance thereof notwithstanding his transfer of the stock. One reason given for this rule was that, by the earlier decisions of the courts of Pennsylvania, a transferee of stock assumed no liability to the corporation for unpaid installments of the stock transferred. In Bell's Appeal, 115 Pa. 88, 8 Atl. 177, 2 Am. St. Rep. 532 (decided in 1886), it was said, however, that Messersmith v. Sharon Savings Bank must not be understood as a decision that the transferee of stock in a corporation which has become insolvent is not liable for the payment of the unpaid portion of the shares held by him when the unpaid capital is required for the payment of the debts of the corporation, and that, sub-

ject to certain exceptions created by statute, the obligation to make good the unpaid portions of capital stock when the necessities of creditors require it is an equitable obligation founded on no statute, and resting upon those who are the owners of the stock at the time of insolvency. To the same effect was the decision in Lane's Appeal, 105 Pa. 49, 51 Am. Rep. 166. While these cases declare that the transferee of stock of an insolvent corporation must pay a pro rata share of the unpaid capital for the benefit of the corporation's creditors, they do not hold that the original subscriber for such stock does not also remain liable on his contract of subscription. The question before us is whether Dunbar was released from his contractual liability by the transfer of the 150 shares.

It is contended by the plaintiff in error that Dunbar's liability to the full par value of the 150 shares is fixed by the seventh section of the street railway act of Pennsylvania, passed June 24, 1889 (P. L. 211), which, after providing that the capital stock of a street railway company shall be divided into shares of fifty dollars each, payable in installments not exceeding $5 per share in any period of 30 days, that stock on which assessments are not paid shall be forfeited, and that no forfeiture of stock shall release or discharge the owner thereof from any liabilities or penalties incurred prior to the time of such forfeiture, declares that:

"When such stock shall have been paid in full the board of directors shall cause certificates for the same to be issued to the parties entitled thereto, signed by the president and countersigned by the treasurer and sealed with the corporate seal of the company, which certificates shall be transferable at the pleasure of the holders, on the books of the company, in person or by attorney duly authorized, in presence of the president or treasurer, and the assignee aforesaid shall thereupon be a member of said corporation."

The argument is to the effect that this section is inconsistent with the theory that an original subscriber for stock of a street railway company may, by assigning his stock before it has been fully paid and before he has received certificates therefor, make the transferee a member of the corporation or escape liability for the unpaid balance. We think the section standing alone should be so construed. But the defendant in error insists that it is modified by a later act of the Legislature of Pennsylvania passed June 24, 1895 (P. L. 258), entitled "An act relating to and regulating the issue and transfer of certificates of stock by companies incorporated under the laws of this commonwealth." It has but two sections, which are as follows:

"Section 1. That any stockholder of any company incorporated under the laws of this commonwealth shall be entitled to receive a certificate of the number of shares standing to his, her or their credit on the books of the corporation, which certificates shall be signed by the president or vice president or other officer designated by the board of directors, countersigned by the treasurer and sealed with the common seal of the corporation, which certificate or evidence of stock ownership shall be transferable on such books at the pleasure of the holder, in person or by attorney, duly authorized as the by-laws may prescribe, subject however to all payments due or to become due thereon; and the assignee or party to whom the same shall have been so transferred shall be a member of said corporation and have and enjoy all the immunities, privileges and franchises and be subject to all the liabilities, conditions and penalties incident thereto, in the same manner as the original subscriber or hold-

177 F.—11

er would have been. And upon a sale of such stock in satisfaction of any debt for which it is pledged the purchaser shall have the right to compel a transfer of such stock upon the corporation books and the delivery of a proper certificate therefor.

"Section 2. That all laws or parts of laws inconsistent herewith be and the same are hereby repealed."

The Kittanning & Cowanshannock Valley Street Railway Company was incorporated under articles of association dated, as previously stated, on December 9, 1901. The act of 1895 seems impliedly to amend or modify the street railway act of 1889. Its title shows that it is intended to relate to and regulate the issue and transfer of stock generally. Its first section applies to any stockholder of any company incorporated under the laws of Pennsylvania, and its second section repeals all laws and all parts of laws inconsistent therewith. It provides that a stockholder shall be entitled to his certificate of stock as soon as he becomes credited with his shares on the books of the corporation; that he may assign his stock before it has been fully paid; that his assignee shall take it subject to all payments due and to become due thereon; that the assignment shall be entered upon the books of the corporation; and that the assignee shall thereupon become a member of the corporation, and be subject to the same obligations as were formerly imposed on his assignor. The case of Railway Co. v. Bily, 11 Pa. Super. Ct. 144, is not in point for the reason that the street railway company there mentioned was incorporated before the act of 1895 was passed. The case of Bank v. Tumbler Co., 172 Pa. 614, 33 Atl. 748, concerning the transfer of stock of a corporation organized under the Pennsylvania general corporation act of 1874 (P. L. 73), is also not in point for the same reason. That the act of 1895 very materially modified the status of stockholders under the general corporation act of 1874 was decided in Sproul v. Standard Plate Glass Co., 201 Pa. 103, 50 Atl. 1003, where it was said:

"Act April 29, 1874, § 7 (P. L. 78), after providing for the issue of certificates of stock to the persons entitled to them, transferable in accordance with the by-laws, etc., prescribed that 'no certificate shall be transferred so long as the holder thereof is indebted to said company, unless the board of directors shall consent thereto.' Without giving the company an express lien, this provision gave what was practically equivalent in the negative power to refuse a transfer. An express lien could be waived or released, and so this potential lien could be waived by consent to transfer, thus substantially producing the same effect. The act of June 24, 1895 (P. L. 258), provided for the transfer of certificates of stock at the pleasure of the holder as the by-laws may prescribe, 'subject to all payments due or to become due thereon,' and then contained the provision in regard to purchasers at sales in satisfaction of debt, already quoted. The only repealing clause is the general one of all laws inconsistent therewith, but as the act of 1895 is upon the same subject and in large part in the same words as section 7 of the act of 1874, but gives an absolute right of transfer inconsistent with the necessity of consent by the board of directors, this requirement of the act of 1874 is necessarily repealed."

We think the act of 1895 as plainly modifies the street railway act of 1889 as it does the general corporation act of 1874, and that the stock of a street railway company organized under the act of 1889, after the passage of the act of 1895, is transferable, and that certificates for it are issuable, before full payment therefor. We think, also, that an original subscriber for such stock, who assigns it in good faith,

is not liable for assessments made thereon after his assignment has been entered on the books of the corporation. The act of 1895 seems to be inconsistent with such a continuing liability. It brings the law of Pennsylvania on the subject of the liability of an original subscriber after a transfer in good faith of his stock into harmony with the general rule in most of the states and in the federal courts. In the states the general rule is that the transferee of stock becomes his assignor's substitute as to liability for all future calls and assessments. 3 Thomp. Corp. § 3221; 1 Cook, Corp. (6th Ed.) § 255; 3 Clark & Marshall, Priv. Corp. § 564a; Clark on Corp. (2d Ed.) p. 398. The cases cited in these text-books fully sustain the above statement of the general rule. The Supreme Court of the United States has established the same rule for the federal courts. In Webster v. Upton, 91 U. S. 65, 23 L. Ed. 384, it was held that, where a transferee of stock has been accepted by the corporation as its owner, he becomes liable for future assessments thereon. This conclusion was evidently founded on the theory that when a transfer of stock is made, and the transferee is registered on the books of the company as the owner of the stock transferred, the transferror is exonerated. In Pullman v. Upton, 96 U. S. 328, 24 L. Ed. 818, Mr. Justice Strong said:

"The creditors of the bankrupt company are entitled to the whole of the capital of the bankrupt as a fund for the payment of the debts due them. This they cannot have if the transferee of the shares is not responsible for whatever remains unpaid upon his shares; for by the transfer on the books of the corporation the former owner is discharged."

In National Bank v. Case, 99 U. S. 628, 631, 25 L. Ed. 448, Mr. Justice Strong again approved the same general rule, saying that one reason for holding a transferee whose stock has been duly entered on the books of the corporation liable for future calls and assessments is "that by taking the legal title he has released the former owner." In that case it appears that the Germania Bank had loaned Phelps, McCullough & Co. $14,000 on a note of the firm and taken from the firm, as collateral security, 100 shares of the stock of the Crescent City Bank. The note not being paid at maturity, the Germania Bank had the stock transferred to it on the books of the Crescent City Bank. Mr. Justice Strong said:

"When, therefore, the stock was transferred to the Germania Bank, though it continued to be held merely as a collateral security, the bank became subject to the liabilities of a stockholder, and the liability accrued the instant the transfer was made. At that instant the liability of Phelps, McCullough & Co. ceased."

In the present case there is no proof that Dunbar's sales of 150 of the 170 shares for which he subscribed were in any wise tainted with fraud. The record shows that some of the transferees have paid in full for the stock assigned to them. Other transferees have paid only a part of the par value of the stock taken by them. In such cases they are liable for what has not been paid, and Dunbar is not.

Of the remaining 20 shares, Dunbar paid for 13 of them in full. On 7 of them he paid nothing. The instruction to the jury was therefore correct. What has been said disposes of all the assignments of error.

The judgment will be affirmed, with costs.